[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 26, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-16495

_____

D. C. Docket No. 00-02280 CV-PCH

INTERNATIONAL COSMETICS EXCHANGE, INC.,
d.b.a.  I.C.E. MARKETING CORP.,
a New York Corporation,

                                        Plaintiff-Counter-
                                        Defendant-Appellant-
                                        Cross-Appellee,

GABY MCHEILEH,
AILATAN INVESTMENTS, INC.,

                                        Counter-Defendants-
                                        Appellants-Cross-
                                        Appellees,

versus

GAPARDIS HEALTH & BEAUTY, INC.,
XAVIER TANCOGNE, et al.,

                                        Defendants-Counter-
                                        Claimants-Appellees-
                                        Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(August 26, 2002)**

Before BIRCH and WILSON, Circuit Judges, and DOWD[*], District Judge.

BIRCH, Circuit Judge:

This appeal arises out of a contract dispute. I.C.E. Marketing Corp. ("ICE"), Gabby McHeileh and Ailatan Investments, Inc. ("McHeileh/Ailatan") appeal a preliminary injunction in favor of Gapardis Health & Beauty, Inc. ("Gapardis") and its principals, Tanios Saba, Abdallah Ghandour, Michel Farah, and Continental Laboratories Medica ("CLM") and its principal Xavier Tancogne. The district court[1] found that the contract between ICE and CLM ("Agreement") was enforceable and that both parties breached the Agreement, although the first breach was by Tacogne and CLM. Furthermore, it found that CLM was entitled to

_____

[*] Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

[1] The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. 636(c)(1). The fact that the order was issued by a magistrate does not affect its appealability. See Ty, Inc. v. The Jones Group, Inc., 237 F.3d 891 (7th Cir. 2001) (reviewing magistrate's interlocutory order granting preliminary injunction without discussing appellate jurisdiction); Doe v. Natl' Bd. of Med. Exam'rs, 199 F.3d 146 (3rd Cir. 1999) (reviewing pursuant to 28 U.S.C. §§ 636(c) and 1292(a)(1) the magistrate's interlocutory order issuing preliminary injunction); Sherri A.D. v. Kirby, 975 F.2d 193 (5th Cir. 1992) (holding it had jurisdiction to review a magistrate's order issued pursuant to § 636(c) as an order with the practical effect of denying an injunction under § 1292).

2

injunctive relief because when ICE began selling non-CLM "FAIR & WHITE" product, ICE caused confusion regarding that trademark, and subsequent sales by McHeileh/Ailatan added to the confusion.  We AFFIRM.

## I. BACKGROUND

CLM, a French corporation, manufacturers and sells ethnic cosmetic products in France and Europe under its trademark "FAIR & WHITE."  CLM's President, Xavier Tancogne, is a chemist with a doctorate in pharmacy and created the formula for the "FAIR & WHITE" products.

ICE, a United States company founded by Michael Aini, is engaged in the purchase, importation, sale and distribution of ethnic cosmetic products.  Aini is also the owner of four "Home Boys" stores in Brooklyn, New York, which are discount stores selling health and beauty aids to the African-American community. While in France, Michael's brother Jacob ("Jack") became interested in "FAIR & WHITE."  In 1998, Jack purchased small quantities of "FAIR & WHITE" products from CLM to test United States market acceptance.  These products were sold in the "Home Boys" stores and were well received.

Thereafter, ICE and CLM entered into contract negotiations to continue "to develop, market and promote the "FAIR & WHITE" brand name in the United

3

States." R1-31-44. The Agreement stated that CLM was the owner of the "FAIR & WHITE" trademark in France and Europe, and that ICE was "the owner and holder of all rights, title and interest in the mark 'FAIR & WHITE' in the United States, Canada and Caribbean Islands." Id. In return, the Agreement obligated ICE to sell $250,000 for the first year and use its best efforts to increase sales by 20 percent per year over the next five years. However, there were no provisions as to purchase or manufacture of the products. Another term of the Agreement was that it would be governed by New York law.

In the fall of 1999, ICE purchased approximately $125,000 of "FAIR & WHITE" product from CLM. ICE applied to register the mark with the United States Patent and Trademark Office in early 2000.

Meanwhile, Michel Farah, owner of Gapardis, a distributor of ethnic products in Miami, became interested in "FAIR & WHITE" products and contacted Tancogne. On 13 April 2000, Farah and his associate Tanios Saba entered into an agreement by which Gapardis became the exclusive distributor in the United States for CLM's cosmetics bearing the "FAIR & WHITE" mark.

At some point, Tancogne became aware that counterfeit "FAIR & WHITE" goods were being sold in the United States. He believed that ICE was responsible and stopped providing ICE with product in April of 2000. ICE then took

4

immediate steps to procure substitute "FAIR & WHITE" products from a Spanish manufacturer, Jabones Pardo. ICE provided Pardo with samples of "FAIR & WHITE" products and the formula of its active ingredients. Thereafter, ICE distributed non-CLM manufactured goods bearing the "FAIR & WHITE" mark and the associated trade names in the United States.

Gaby McHeileh with Ailatan Investments, Inc. was in business with Michel Farah. When McHeileh was excluded from the agreement between CLM and Gapardis, he began to receive and sell product from other sources, which were believed to be counterfeit "FAIR & WHITE" products. As a result of undercover purchases in several Florida stores, it was established that McHeileh/Ailatan was selling counterfeit "FAIR & WHITE" product. The "FAIR & WHITE" products were identified as counterfeit because they contained a small visible "pipette" inside the bottle, which is not present on the CLM manufactured product. <u>See generally</u> R3-258.

ICE filed an action under the Lanham Act, 15 U.S.C. § 1125, against Gapardis and its principals, Saba, Ghandour, Farah, and CLM and its principal Tancogne asserting *inter alia*, trademark infringement and breach of contract. ICE sought a preliminary injunction for infringement of its United States trademark rights to the "FAIR & WHITE" mark.

Gapardis, CLM, and Tancogne counterclaimed against ICE and added counter-defendants McHeileh/Ailitan. Also alleging Lanham Act violations and related state law claims, they moved for a preliminary injunction to prevent ICE and McHeileh/Ailitan from importing or selling counterfeit CLM goods under the "FAIR & WHITE" mark and its associated trade names.

The district court found that the ICE/CLM Agreement was enforceable and, according to the Agreement, ICE was owner and holder of all rights in the "FAIR & WHITE" mark in the United States. It concluded that Tancogne breached the Agreement when CLM, without notifying ICE, obtained a more favorable agreement with Gapardis, and when CLM failed to supply ICE with "FAIR & WHITE" products. However, ICE could not show irreparable harm to substantiate a preliminary injunction because ICE had breached the Agreement by selling counterfeit "FAIR & WHITE" products. The district court determined that the "FAIR & WHITE" mark reverted back to CLM. Further, ICE and McHeileh/Ailitan were enjoined from using the "FAIR & WHITE" mark and associated trade name, and from importing and distributing "FAIR & WHITE" products into the United States.

## II. DISCUSSION

First, we affirm the ruling that the ICE/CLM Agreement was enforceable. CLM argues that the Agreement was an invalid "'assignment in gross,' which at minimum assigned the mark to ICE only in conjunction with the sale of genuine CLM-manufactured products." Appellee Brief at 25. CLM maintains that ICE was only interested in owning the mark and did not purchase its formula or any assets. However, it is well-settled law that "the transfer of a trademark or trade name without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights." Berni v. Int'l Gourmet Rest. of Am., 838 F.2d 642, 646 (2d Cir. 1988). Although an assignment must be accompanied by the attendant good-will, there need not be any transfer of tangible assets. See Defiance Button Mach. Co. v. C & C Metal Prod. Corp., 759 F.2d 1053, 1059-60 (2d Cir. 1985). "[A]n assignment of United States trademark rights by a foreign manufacturer to its United States distributor ordinarily will not be regarded as an assignment in gross, even if the transfer occurs after the designation has acquired trademark significance in this country." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 29:8 (4th ed. 2002) (citation omitted).

As the district court correctly notes, the Agreement clearly recognizes the

7

prior efforts of ICE with respect to "FAIR & WHITE" product:

> I.C.E. has developed, distributed and marketed the "FAIR & WHITE" brand name in connection with the Products in the United States . . . and as a result of I.C.E.'s efforts, the "FAIR & WHITE" brand name has achieved wide-spread popularity, recognition and awareness, and has become known to retailers and consumers in the United States . . . .

R1-31-44. Thus, at the time the Agreement was created, the assignment was not in gross because it continued the association of the "FAIR & WHITE" trademark with the very goods which created its reputation. Thus, we agree with the district court that the Agreement was enforceable. Having established that the Agreement was enforceable, we analyze the appropriateness of injunctive relief.

"The grant or denial of a preliminary injunction is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002). A party seeking a preliminary injunction for trademark infringement must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." Levi Strauss & Co. v. Sunrise Int'l Trading Co., 51 F.3d 982, 985 (11th

8

Cir. 1995) (quotation omitted).

A.    *ICE's Entitlement to Injunctive Relief*

The district court found that ICE established a substantial likelihood of success as to its claim against CLM for breach of contract. The essential elements of an action for breach of contract under New York law are: (1) formation of a contract between the parties; (2) performance by ICE; (3) non-performance by Tacogne and CLM; and (4) resulting damages to ICE. See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000) (quotation omitted). The evidence supports the finding that there was an Agreement between CLM and ICE, and that ICE made an initial order for approximately $125,000 of product in August of 1999. CLM and ICE agreed that ICE would use its best efforts to sell $250,000 of "FAIR & WHITE" product within the first year of the Agreement and 20 percent more within the next five years. CLM failed to supply ICE with "FAIR & WHITE" product, and therefore, breached the Agreement. In addition, the district court concluded that CLM's contract with Gapardis further violated the Agreement, which granted ICE exclusive distribution rights in the United States as well as exclusive ownership of the "FAIR & WHITE" mark.

Even though ICE established a likelihood of success as to its claim for breach, the district court found that ICE could not show irreparable harm to

9

warrant injunctive relief. The district court concluded that ICE also breached the Agreement when it began to manufacture and sell counterfeit "FAIR & WHITE" product. Moreover, by virtue of both parties' breach of the Agreement, the district court found that the ICE no longer had exclusive distribution rights in the United States and that the "FAIR & WHITE" mark reverted back to CLM. Reasoning that ICE could be compensated for the distribution period when it was the exclusive distributor of "FAIR & WHITE" products in the United States, the court determined that an injunction was not warranted.

ICE maintains that it exercised the ordinary rights of a trademark owner and of a buyer of goods when it procured substitute goods as "cover." It relies on New York Uniform Commercial Code § 2-712, which states that a non-breaching party to a contract is entitled to obtain substitute goods. N.Y. U.C.C. § 2-712 (McKinney 2002). However, § 2-712 defines "cover" as requiring "good faith" and a reasonable purchase of goods. Id. There was no evidence that ICE communicated to Tancogne that it was going to secure "FAIR & WHITE" product from a different source or that CLM was in breach of the Agreement for refusing to ship the product. Moreover, the district court found that "[w]hen read in conjunction with paragraph C, it is clear that the 'Products' referred to in the [Agreement] are those of CLM, especially when the concern regarding counterfeit

10

products is mentioned in paragraph C."[2]  R3-247-28.  Therefore, selling non-CLM manufactured "FAIR & WHITE" product went beyond the scope of the Agreement.  If CLM breached the Agreement when it stopped selling "FAIR & WHITE" product to ICE, ICE's remedy was to sue for breach of contract, not to palm off a different product as the product it could no longer obtain.  See Green River Bottling Co. v. Green River Corp., 997 F.2d 359, 362 (7th Cir. 1993) ("[u]nauthorized use of a trademark is an infringement, and we have held that the infringement of a trademark is not a proper self-help remedy for a breach of a contract.").

Additionally, ICE maintains that there was no reversion clause in the Agreement and that it is still the owner of the "FAIR & WHITE" mark in the United States.  "The . . . agreement controls the rights of the respective parties in the use of the [mark]."  Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co., 513 F.2d 1183, 1186 (2d Cir. 1975).  The apparent intent of the contract is to

---

[2] Paragraph C of the Agreement states:
> Both I.C.E. and C.L.M. desire to enter this Agreement in the furtherance of their mutual objective of continuing to develop, market and promote the "FAIR & WHITE" brand name in the United States, Canada, the Caribbean Islands, and Europe, and in furtherance of their mutual desire to ensure the proper and swift policing, enforcement and seizure of counterfeit products bearing the "FAIR & WHITE" brand name in the United States.

R1-31-44.

11

further CLM and ICE's "mutual objective of continuing to develop, market and promote the "FAIR & WHITE" brand name in the United States . . . and in furtherance of their mutual desire to ensure the proper and swift policing, enforcement and seizure of counterfeit products bearing the "FAIR & WHITE" brand name in the United States." R1-33-44. Finding that ICE maintained ownership of the trademark after the Agreement was terminated would tend to undermine the Agreement and the operation of the rights sought to be protected by trademark law generally. "Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public . . . ." Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984). Since ICE had no right to continue using the "FAIR & WHITE" mark after losing access to the trademarked product, it also had no right to prevent CLM from using the trademark on the grounds that by doing so would confuse consumers. Any confusion is due to ICE's palming off another product as "FAIR & WHITE."[3] Consequently, ownership rights to the "FAIR & WHITE" mark in the United States reverted back

---

[3] ICE maintains that CLM's ownership of the "FAIR & WHITE" mark in Europe is irrelevant when considering likelihood of confusion. The territoriality doctrine states that a trademark has a separate existence in each sovereign territory in which it is registered or legally recognized as a mark. E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985)(holding that the district court commits error to the extent that it relies on use, goodwill, or the rights in a foreign country). Territoriality is not an issue since the rights to the "FAIR & WHITE" mark in the United States reverted back to CLM.

to CLM. Therefore, ICE is not entitled to injunctive relief because it has no longer has a property interest in the trademark.

B.      *CLM's Entitlement to Injunctive Relief*

The district court found that when ICE began selling counterfeit product, it caused a likelihood of confusion regarding the "FAIR & WHITE" mark and that subsequent sales by McHeileh/Ailatan added to the confusion. "While the trademark laws could not provide a basis for relief unless there was a breach of contract," CLM established that ICE breached the Agreement and thus trademark law is applicable to claims of unauthorized use of the mark. Sterling Drug Inc. v. Bayer AG, 792 F. Supp. 1357, 1372 n.12 (S.D.N.Y. 1992). In order to succeed on the merits of a trademark infringement claim, CLM must show that the ICE used the mark in commerce without its consent and "that the unauthorized use was likely to deceive, cause confusion, or result in mistake." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998). There can be no dispute that the parties' concurrent use of the "FAIR & WHITE" mark poses a substantial likelihood of confusion among consumers. See Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1346 (E.D.N.Y. 1994) (confusion inevitable since "parties are selling same products in the same channels of commerce under the guise of the identical Dial-A-Mattress mark").

13

The district court further decided that CLM demonstrated a substantial threat of irreparable injury if injunctive relief was not granted. It is clear from the evidence that ICE and McHeileh/Ailatan were selling counterfeit "FAIR & WHITE" product in the United States. Furthermore, as stated by the district court, "the threatened injury to CLM, by confusion in the market regarding the F&W Mark, outweighs any harm to ICE in preventing it from selling product supplied by third parties, particularly in light of the Court's finding that ICE is no longer the exclusive distributor." R3-247-34.

AFFIRMED.