**Xavier Pierre TANCOGNE and Gapardis Health and Beauty, Inc., Plaintiffs,**

v.

**TOMJAI ENTERPRISES CORPORATION, Aimalohi Imana, and G & P Factory Outlet Corp., Defendants.**

**No. 05–21327–CIV.**

United States District Court, S.D. Florida.

Nov. 15, 2005.

---

David M. Rogero, Xavier Pierre Tancogne & Gapardis Health and Beauty, Inc., Coral Gables, FL, for Plaintiffs.

Michael H. Blacker, Miami, FL, John H. Oltman, Ft. Lauderdale, FL, for Tomjai Enterprises Corporation & Aimalohi Imana.

Tom F. Almon, Miami, LF, for G & P Factor Outlet Corp.

*ORDER (i) GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, AND (ii) DENYING DEFENDANT TOMJAI ENTERPRISES CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION*

KLEIN, United States Magistrate Judge.

This matter comes before the Court upon Plaintiffs' Motion for Preliminary Injunction (D.E. No. 19) filed on July 8, 2005; Defendant/Counter–Plaintiff Tomjai Enterprises Corporation's ("Tomjai") Motion for Preliminary Injunction and Restraining Order (D.E. No. 43–1, 43–2) filed on August 1, 2005; and the affidavits and declarations filed by both sides in support of and opposition to the preliminary injunction motions.[1] The Court conducted an evidentiary hearing on September 28 and October 6–7, 2005, during which both sides presented testimony and evidence. Based on the motions and responses thereto, the testimony of witnesses (live and by affidavit), the evidence in the record, and the oral and written arguments of counsel, the Court GRANTS Plaintiffs' motion for preliminary injunction and DENIES Defendant Tomjai Enterprise Corporation's motion for preliminary injunction, for the reasons set forth below.

## INTRODUCTION

### A. Procedural History

Plaintiffs Xavier Pierre Tancogne ("Tancogne") and Gapardis Health and Beauty, Inc. ("Gapardis") commenced this action against Defendants Tomjai Enterprises Corporation ("Tomjai") and its President, Aimalohi Imana ("Imana"), as well as G & P Factory Outlet Corp. ("G & P") (D.E. No. 1).[2] Plaintiffs seek relief under the Trademark Counterfeiting Act of 1984, 15 U.S.C. §§ 1116–17; Sections 32 and 43 of the Lanham Trademark Act, 15 U.S.C. §§ 1114, 1125; as well as Florida common law prohibiting unfair competition and unjust enrichment.

Defendants answered, raising numerous affirmative defenses, and filed a Counterclaim against Plaintiffs, alleging trademark and trade dress violations, tortious interference, and slander (D.E.Nos.15–1, 40).[3]

Both Plaintiffs and Defendants have filed motions for preliminary injunction pursuant to the Lanham Act, 15 U.S.C.

---

1. Based on the parties' consent, this case was referred to the undersigned United States Magistrate Judge to take all necessary and proper action as required by law and to render a final Order on all pretrial motions. (D.E. No. 76).

2. The Court will use the term "Plaintiffs" to mean one or both Plaintiffs, and "Defendants" to mean Tomjai and/or Imana, unless a distinction is necessary. The Court will distinguish the individual parties when necessary.

3. Following the entry of Judge Lenard's Orders dated July 12 and 22, 2005 (D.E.Nos.30, 39), only Defendants' Verified Answer—filed as Docket Entry No. 15–1—remained in the record. Defendants' Counterclaim was filed shortly thereafter, on July 26, 2005, as Docket Entry No. 40.

§§ 1114, 1116, and Federal Rule of Civil Procedure 65. (D.E. Nos. 19 and 43). Plaintiffs, in their motion, claim that Defendants' use of their mark infringes on Plaintiffs' mark and has created a likelihood of confusion among the relevant buying public. Defendants, in their motion, claim that Plaintiffs' products infringe on Defendants' use of their mark and trade dress and creates a likelihood of confusion among the public. They also seek to restrain Plaintiffs from tortiously interfering with their business relationships with their customers.

## B. Factual Background

Plaintiff Gapardis is the exclusive licensee and distributor for Plaintiff Tancogne with regard to the sale of cosmetic products imported and distributed by Tancogne. Tancogne owns a collection of registered trademarks, including "Fair & White," "Paris Fair & White," and "Fair & White Health Security Labo Derma Paris." Defendant Imana owns, operates, and manages Defendant Tomjai as its sole operator and director. Tomjai is also engaged in the distribution and sale of beauty and cosmetic products on the retail and wholesale markets.

This case concerns the alleged infringement of trademarks related to cosmetic supplies, marketed primarily to ethnic Carribean and African women, that are designed to lighten the skin. Plaintiffs market and sell a large line of lightening products that include four items: lightening lotion, lightening cream, lightening gel, and exfoliating lightening soap. Defendants market and sell only four items, identical to those four of Plaintiffs' products set forth above. Plaintiffs market, sell, and distribute their line of products under the name "Paris Fair & White"

pursuant to the registered marks. Defendants' products are marketed, sold, and distributed under the name "Fair & Brite Paris." [4]

Plaintiffs' marks have been used on a variety of cosmetic products and are distributed through some 6,000 retail stores in the United States, including some 250 stores in Florida. In the past two years, Plaintiffs have sold almost one and a half million units of products bearing the "Paris Fair & White" and "Fair & White" marks. Although Defendants' distribution network is much smaller, they sell and distribute their products to the same retail stores.

Both competing lines of products contain the word "Paris" on the label of each of their products. Plaintiffs' use of the word "Paris" is such that it appears before the words "Fair & White," while the word "Paris" on Defendants' product appears after the name "Fair & Brite." Plaintiffs' line of products are manufactured in Paris, and are packaged in a variety of colors and forms. They recently added a line of products in a fuchsia-colored package. Defendants' four products are all packaged in an identical fuchsia color.

Plaintiffs claim that Defendants' use of the brand name "Fair & Brite Paris" so closely resembles Plaintiffs' name and design as to infringe on Plaintiffs' trademark rights, resulting in monetary damages as well as harm to the reputation and goodwill that Plaintiffs have earned with regard to their products in the eyes of consumers. Plaintiffs assert that Defendants purposely incorporated similar trademark elements with an intent to reproduce and counterfeit Plaintiffs' trademark and to confuse those members of the consuming public intent on purchasing Plaintiffs' "Fair & White" and

---

4. Defendants filed an application with the U.S. Patent and Trademark Office in January 2004 to register the mark "Fair & Brite" although the products bear the mark "Fair & Brite Paris."

"Paris Fair & White" products to be deceived into purchasing Defendants' "Fair & Brite" products instead. Moreover, Plaintiffs contend the similarity and confusion is enhanced by virtue of Defendants' adoption of a trade dress in a fuchsia-colored packaging which copies Plaintiffs' new line of fuchsia-colored packaged products.

In Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, Defendants contend that they took pains to distinguish their trade name and dress from any other competing products on the marketplace, including Plaintiffs'. Defendants claim that their use of the name "Fair & Brite" together with the word "Paris" simply describes the "nature of the product and its purpose." *See* Defendants' Response (D.E. No. 65) at 4 n. 1. The inclusion of the word "Paris" simply denotes the place of manufacture of their products. Moreover, they assert, the choice of color, the inclusion of a crescent moon logo, and the type of dispenser containing the product all created a distinctive packaging that could easily be distinguished from the Plaintiffs' line of "Paris Fair & White" products. In their counterclaim, Defendants contend that Plaintiffs have infringed on their "Fair & Brite" trademark and trade dress by copying Defendants' four-product fuchsia-colored line.

### Preliminary Injunction Standard

■ All parties agree that a preliminary injunction should be granted only if: 1) the moving party has a substantial likelihood of success on the merits; 2) failure to issue the preliminary injunction will result in irreparable injury; 3) the harm facing the moving party outweighs the potential damage that the injunction poses to the non-moving party; and 4) issuing the injunction would not be adverse to the public interest. *See, e.g., Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1246 (11th Cir.2002); *Am.*

*Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1410 (11th Cir.1998). At the preliminary injunction stage, the Court may rely on "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982, 985 (11th Cir.1995) (citation omitted). A preliminary injunction is an "extraordinary and drastic remedy" and will not be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (citations omitted).

■ While equitable relief in a trademark case should be narrowly tailored to cure the ongoing harm by distinguishing the infringing product from the original, *see B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1269 (5th Cir. 1971), preliminary injunctive relief is often appropriate in such cases because of the potential for irreparable injury that can cause damage to a trademark holder's reputation that are not easy to calculate, compensate, or prove with specificity. *See Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, 95 (2nd Cir.1985) (noting that "[r]eputation is not calculable nor precisely compensable" in its assessment of the irreparable injury prong); *Multi–Local Media Corp. v. 800 Yellow Book, Inc.,* 813 F.Supp. 199, 202 (E.D.N.Y.1993) ("Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty of proving monetary damages.").

### Lanham Act Standard

Section 32 of the Lanham Act (15 U.S.C. § 1114(1)) provides for liability of a

person who, without consent of a trademark registrant, uses in commerce "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." In this circuit, seven factors have been identified to assist in answering the question of whether there is a likelihood of confusion between the registered mark and the alleged infringing mark. They are: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 122 F.3d 1379, 1382 (11th Cir.1997); 1*Dieter v. B & H Indus. of S.W. Fla., Inc.,* 880 F.2d 322, 326 (11th Cir.1989).

■ Of these seven factors, the Eleventh Circuit considers the type of mark and the evidence of actual confusion to be the two most important factors. *Longhorn Steaks,* 122 F.3d at 1382; *Dieter,* 880 F.2d at 326. In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court "must take into consideration the circumstances surrounding each particular case." *Dieter,* 880 F.2d at 325 n. 3. To establish a likelihood of confusion all factors do not have to be resolved in favor of the plaintiff. *See Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir.1982).

### ANALYSIS

### I. Plaintiffs' Motion for Preliminary Injunction

#### 1. *Type of Mark*

This factor denotes the strength of the mark. The stronger the mark, the greater the protection it is afforded. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 973–74 (11th Cir.1983). Four categories of strength are recognized: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Am. Television v. Am. Communications,* 810 F.2d 1546, 1548 (11th Cir.1987). These categories are based on the relationship between the name and the service or good it describes.

A generic name suggests the basic nature of the article or service, and usually gets no protection. *Id.* at 1548. Thus, the terms "bank," "electrician," "soap," or "restaurant" standing alone would receive no trademark protection.

■ A descriptive term identifies qualities or characteristics of the goods or services with which they are connected, such as color, odor, function, dimensions, or ingredients. Examples of such terms are "sweet," "large," "mellow," and "strong," or "cleanser," "detergent," and "conditioner." If a word mark is found to be descriptive, it is protectable only if the owner can show the mark has acquired a secondary meaning. *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182 n. 5 (11th Cir.1985). To establish a secondary meaning in this circuit, a plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product, but the producer." *Vision Ctr. v. Opticks, Inc.,* 596 F.2d 111, 118 (5th Cir.1979) (citation omitted).

A suggestive terms suggests, rather than describes, a characteristic of the goods or services and "requires an effort of the imagination by the consumer in order to be understood as descriptive." *Am. Television,* 810 F.2d at 1549. The combination of two or more descriptive words as a composite mark may result in a suggestive term. 2 *McCarthy on Trademarks and Unfair Competition* § 11.26 (4th ed.). Thus, for example, in *Application of Colonial Stores, Inc.,* 55 C.C.P.A. 1049, 394 F.2d 549 (Cust. & Pat.App.1968),

the terms "sugar" and "spice" were considered individually to be descriptive terms for bakery products, since they described ingredients of some bakery goods. However, when combined, they became suggestive, since the combination evoked more than just a description of ingredients. *See Vision Ctr.*, 596 F.2d at 116 ("[c]ommon ordinary words can be combined in a novel or unique way and thereby achieve a degree of protection denied to the words when used separately."); *In re Desoto, Inc.*, 172 U.S.P.Q. 497, 1972 WL 17680 (Trademark Tr. & App. Bd.1972) (FAMOUS FLOCKS non-descriptive of woven wall covering). A suggestive mark is entitled to protection against infringement under the trademark laws. *Sun–Fun Products, Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 191 n. 5 (5th Cir.1981); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir.1980).

The fourth and final category, arbitrary or fanciful, receives the most protection based on the strength of the mark. Fanciful marks are terms which are "coined" and have no apparent meaning. Examples of such terms are "Cingular," "Kodak," and "Xerox." An arbitrary term is one "in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service." *Jellibeans, Inc. v. Skating Clubs*, 716 F.2d 833, 841 (11th Cir.1983). An example of such an arbitrary term is Apple Computers.

In assessing the strength of a mark, and attempting to fit a term into a precise category, one court observed that "these useful labels are instead central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply." *Soweco*, 617 F.2d at 1183.

▪ In this instance, the composite term "Fair & White" suggests the effect that the line of products at issue here, i.e., skin lightening agents, will have when the consumer uses them. The combined term does not describe ingredients of the products or their quality. The products themselves are not "fair" and "white." Instead, the terms arouse the imagination, and conjure up an image of what the products are intended to do: make the skin fair and white. Thus, the trademarked term "Fair & White" falls at the edge of the category "suggestive," merging at the border of terms which are descriptive,[5] and is therefore entitled to a modicum of protection against infringement; the protection it receives, although limited, requires taking into account the nature of the alleged infringing product, the scope of the infringement, and the degree of competition between the products at issue.

▪ The trademarked term "Paris Fair & White" lies further on the continuum of the strength of the mark, and is entitled to greater protection than "Fair & White." However, it is more suggestive, since the term "Paris" in connection with cosmetics connotes the geographical center of style and beauty, and thus requires the consumer to exercise some imagination that the product embodies a particular quality or attribute. *See, e.g., id.* at 1184 ("If used as a trademark for refrigerators, the term 'Penguin' would be suggestive."). Ordinarily, a geographical term by itself receives no protection. *See, e.g., World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 485–86 (5th Cir. 1971) (citing 15 U.S.C. § 1502(e)(2), court explained that "Congress has expressly left accessible to all potential users those names of subdivisions of the earth—re-

5. For example, "Fair & White" could also apply to other products such as toothpaste or laundry detergent, and it would suggest what those products do rather than describing a characteristic of the goods or services.

gions, nations, counties, towns, rivers, lakes, and other natural and artificial geographical units—which could be employed to draw public attention to the origin of a product or the situs of a business."). It is no different than any other generic or descriptive term. However, when used in combination with other descriptive terms, the synergy of the combined term is entitled to protection under the trademark laws. *See, e.g., California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir.1985) (court rejected the argument that the words "California" and "Cooler," which admittedly were geographic and generic in nature, were incapable of achieving distinctness; court held that the validity of the composite term "California Cooler" was not judged by examining its parts but rather by viewing the trademark as a whole). The distinction between the status of protection afforded "Fair & White" and "Paris Fair & White" is largely academic, since it is essentially Plaintiffs' "Paris Fair & White" mark that is at issue here. As stated, it is entitled to greater protection because of its suggestive nature.

Another consideration in determining the strength of the mark is third-party use. *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan*, 651 F.2d 311, 315–16 (5th Cir.1981). Extensive third-party use of a term weakens the mark. *Id.; Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir.1980). Defendants have introduced a number of other competing products with purportedly similar names to show third-party use, as well as to show that the individual terms in Plaintiffs' marks are commonly used in the names of competing products. They include "Derma White," "Dermo White," "Skin White," "Body White," "Fairskin," "Naturally Fair," "Fair & Beautiful," "Fair & Lovely," "Sure White," "Maxi Light," and "Fair and Balance." None of these competing products uses the combination trademark

term "Fair & White," or "Paris Fair & White," and therefore do not qualify as third-party use. In addition, Plaintiffs have shown that they, themselves, own one of those products and have taken action to enjoin the usage of those that closely resemble Plaintiffs' mark.

The use of the individual terms "Paris," "fair," or "white" alone or with other words do not constitute third-party use of the precise terms "Fair & White," or "Paris Fair & White" which are the registered marks at issue here. However, use of those individual terms, i.e., "Paris," "fair," and "white," receive little protection in view of their descriptive nature and extensive third-party use. *See, e.g., Freedom Sav. & Loan Ass'n*, 757 F.2d at 1182 (noting other businesses offering real estate and financial services use the name "Freedom"); *Amstar Corp.*, 615 F.2d at 259–60 (use of "Domino" by Plaintiff's sugar brand suffers diminished strength of its mark in view of extensive third-party use of "Domino" in connection with many other products, thereby precluding relief against Defendant, Domino's Pizza). It is only in combination that the terms would be entitled to some protection.

Defendants contend that because the individual words in Plaintiffs' mark are all used in other skin lightening products, they therefore get no trademark protection. To be sure, the words in the trademark, "Paris," "fair," and "white" are all common words. Were the businesses or products of the alleged infringers in this case different from that of Plaintiffs, there would be less inclination to protect the use of them even in combination. Plaintiffs might be hard-pressed to prevent a totally different product or service from using those words. *See, e.g., Sun Banks of Fla.*, 651 F.2d at 316–17. But where, as here, and as will be elucidated in later sections of this order, Defendants are capitalizing

on those words with identical products directed to the same market and bearing a similar mark; by virtue of Defendants essentially playing on the registered word combination with a close copy, Plaintiffs are entitled to the protection of the trademark laws against this particular use, as opposed to non-competing uses. However, since Defendants are not using the exact term "Paris Fair & White," other factors, especially actual confusion and intent, take on added significance. No single factor is determinative. Marks must be compared in their entireties in connection with the particular goods or services for which they are used. *In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed.Cir.1985).

### 2. *Similarity of the Mark*

 In evaluating the similarity of marks, the inquiry must be "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir.1985). "[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re National Data Corp.*, 753 F.2d at 1058. In this instance, there is considerable similarity between the marks. "Fair & Brite" has a similar sound as "Fair & White," and by Defendants using the term "Brite" instead of "Bright," it has enhanced the similarity of the look of the terms. The font in the competing products is extremely similar, and the stylized ampersand of Defendants is identical to that of Plaintiffs.

 Defendants' placement of the words "Fair & Brite" with the words "Fair" over the word "Brite," connected with an ampersand, with the word "Paris"

prominently displayed next to the name, is remarkably similar to Plaintiffs' display of "Fair & White" and "Paris" on their products. In addition, Defendants have chosen a fuchsia background color (described by Plaintiffs as pink) which is identical to a new line of products introduced by Plaintiffs.[6] Although Defendants' line of products are different from Plaintiffs' fuchsia-colored line, and are in actuality the same as Plaintiffs' other products packaged in different forms and colors, their fuchsia-colored line is confusingly similar in appearance to Plaintiffs' fuchsia colored line. The gray-white lettering on Defendants' products is virtually identical to the gray-white lettering on Plaintiffs' new product line. The overall look and appearance of Defendants' line is virtually identical to Plaintiffs' new line.

Although "Fair & White" products are packaged in a variety of forms and colors, Defendants' depiction of their mark is so similar to Plaintiffs' mark so as to create an overall impression of striking similarity with the Plaintiffs' various lines. These are strong considerations in determining the likelihood of confusion.

Defendant Imana contends that she developed the fuchsia-colored line of products first, and that Plaintiffs copied her design. However, there is no credible evidence to support this proposition. Considering that Plaintiffs have a long-established line of products using many different colors on their packaging, and Defendants were total newcomers to the market, there would be little incentive or logical justification for Plaintiffs to copy Defendants' mark or trade dress. Given the similarities between Defendants' and Plaintiffs' marks and designs, it is impossible to attribute these resemblances to

---

**6.** Color, in the absence of secondary meaning, can never be inherently distinctive. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). But the other elements of the two marks are virtually identical in appearance.

mere coincidence; one of them copied the mark and design of the other.

After considering the testimony of witnesses for both sides, the Court finds Plaintiffs' witnesses to be credible on the issue of their earlier design and use of their mark on the fuchsia line of products, and rejects the testimony presented by Defendants on their claim of an earlier design and use of its mark.

Buttressing this conclusion is the fact that Plaintiffs' fuchsia-colored line appeared in prototype form in Paris in early 2004 and was marketed in other countries in the autumn of 2004. Imana, or those acting on her behalf, would have had access to the Plaintiffs' product line's design. Imana, on the other hand, staunchly contends that her design was a closely guarded secret and was not available to anyone until its launch in the United States in January, 2005.[7] Plaintiffs' fuchsia colored-line first appeared on the shelves in the United States in March, 2005. Based on all the testimony from both sides, it would have been physically impossible for Plaintiffs to copy Defendants' design and get their products into the market in one month. Only in Greek mythology did Athena spring full-grown from the forehead of Zeus. Mortals require planning and preparation for such a birthing event. Moreover, Imana presented highly dubious testimony that her Paris chemist tested her products by having Imana and a few of her friends try the products and report the results back to the chemist. The chemist issued no written report, but apparently opined that the products were safe and efficacious based on the unscientific anecdotal results reported by Imana and her friends.[8]

One other testimonial vignette bears note. Defendant Imana attempted to justify her use of the word "Paris" in her products' labels by claiming that her products were in fact manufactured in Paris. However, Michel Farah, Plaintiff Gapardis' principal, testified that he owned a tube-packaging machine which he lent to a company in Switzerland to be used for manufacturing and packaging some of Plaintiffs' other products. In a court-authorized raid, Farah discovered the presence of "Fair & Brite" soap on the premises, and also learned that the company was using his machine to package Defendants' tube products in Switzerland. He was able to verify this by batch coding on the "Fair & Brite" tubes he examined elsewhere, and by the unique crimping done on the bottom of the tubes after they were filled. In response, Imana testified that the empty tubes were shipped from Switzerland to Paris, where they were then filled. Presumably, since the tubes were totally closed at that point, the process would have been similar to squeezing toothpaste back into a tube, and then sealing it with the puncturable metal seal before the cap is placed on the tube. The Court finds Imana's testimony on this point not worthy of belief.

Defendants' introduction of various third party products also supports the similarity of the marks at issue here. The third party products contain various different names, different colors, design, fonts, and layouts. Of all the infinite possibilities, Defendants chose an overall look and design which is virtually identical to that of

---

7. Defendants did present testimony that their products were sold in Africa at the end of 2004.

8. Plaintiffs presented credible testimony that there is a 6–12 month testing period for new products, and a 6–8 month lead time in preparing packaging for such products. Plaintiffs' fuchsia-colored lines required and used such time before coming to the market.

Plaintiffs. Courts look with suspicion upon one who "approaches so near to his successful rival that the public may fail to distinguish between them." *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 704 (5th Cir. 1981) (citation omitted). This weighs heavily on the similarity scale in the calculus of the likelihood of confusion.

### 3. *Similarity of the Products the Marks Represent*

The products at issue here are identical. Defendants have four products: lightening lotion, lightening cream, lightening gel, and exfoliating lightening soap. Plaintiffs have the same products, albeit packaged differently. All are intended to lighten the skin.

### 4. *Similarity of the Parties' Retail Outlets and Purchasers*

The retail outlets and purchasers of Plaintiffs' and Defendants' products are identical, even though Defendants' network is much smaller than Plaintiffs'.

### 5. *Similarity of the Advertising Media Used*

Defendant Imana testified that she advertises on Haitian and Jamaican television and radio. Defendants also have a website and advertise their products on their website. Plaintiffs do no TV or radio advertising. They advertise in trade journals and on their website. The similarity of advertising is minimal. This is a relatively minor factor compared to the other components analyzed to determine the likelihood of confusion.

### 6. *Defendants' Intent*

■■■■ The Court may also examine Defendants' subjective intent in assessing the likelihood of confusion between the two marks. *John H. Harland Co.,* 711 F.2d at 977 (if "a plaintiff can show that a defendant adopted a mark of the plaintiff with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" (citation omitted)). "To determine whether a defendant has acted in bad faith, a court must examine 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Michael Caruso & Co., Inc. v. Estefan Enters., Inc.,* 994 F.Supp. 1454, 1462 (S.D.Fla.1998) (citing *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955 964 (2d Cir.1996)).

Intent, most often, must be proved by circumstantial evidence. *Jellibeans,* 716 F.2d at 843. In this instance, Defendant Imana had more than passing familiarity with Plaintiffs' products. She had distributed the "Paris Fair & White" line beginning in 1997, but after learning that Plaintiff Gapardis had an exclusive distributorship for the products, she stopped distributing them. She testified that she began designing and developing the "Fair & Brite" line in 2004, and began distribution in February 2005. She stated that she used the term "Brite" because her customers didn't want white, but instead wanted bright skin. She also testified that she was aware of the "Fair & White" and the "Paris Fair & White" lines, that she had concerns about Michel Farah (Gapardis' principal), and that is why she made her products' design and marks so different. She claims she was unaware of Plaintiffs' fuchsia-colored line and that Gapardis copied her design and marks. Coincidentally, her line of products replicate Plaintiffs' best selling products.

The Court finds Defendant Imana's testimony not credible. Her claimed reason for choosing the word "Brite" is disingenuous, since a perusal of the labels on her

products discloses that all claim to be skin lightening agents. The one product that has the words "Brighten Lotion" on its label, also states in the "Indications" section on the back of the product that it "acts against the formulation of new pigment spots *while lightening the skin quickly* " (emphasis supplied). As for her claim that she did all she could to make the products different, that too is not credible. Examining all the third party products, and the infinite variables that are employed by these products, it defies logic and common sense that the only combination Defendant Imana could come up with wound up bearing such an uncanny resemblance to Plaintiffs' products.

For the reasons stated earlier and in this subsection, the Court finds that Defendants copied Plaintiffs' trademark on all their products, and also copied Plaintiffs' fuchsia-colored line's trademark and design. In so doing, they exercised bad faith by attempting to capitalize on Plaintiffs' reputation and goodwill established for their products, and in particular, in their best selling products; they thereby created confusing similarity between the products.

### 7. *Actual Confusion*

Although evidence of actual confusion between trademarks is not necessary for a finding of likelihood of confusion, any such actual confusion is the best such evidence. *E. Remy Martin & Co.*, 756 F.2d at 1529; *John H. Harland Co.*, 711 F.2d at 978. Although the extent of such actual confusion will determine the weight to be given it, the court in *John H. Harland Co.* noted that in *Safeway Stores Inc.*, 675 F.2d at 1166–67, the court held that two instances of actual confusion were "worthy of consideration" as sufficient evidence of actual confusion. The court further cited *World Carpets*, 438 F.2d at 490, which held that "reason tells us that ... very little proof of actual confusion would

be necessary to prove the likelihood of actual confusion."

Actual confusion is one of the two factors considered in this circuit to be the most important in determining likelihood of confusion. *Longhorn Steaks*, 122 F.3d at 1382; *Dieter*, 880 F.2d at 326. "The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion." *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir.2000).

In this instance, there was ample evidence of actual confusion. Zaher El Khatib, a wholesale distributor of Plaintiffs' products, testified that he heard customers on several occasions in retail stores refer to the "Fair & Brite" products as the new "Fair & White." His declaration, supported by testimony, stated he found "Fair & Brite" products displayed in one of the display cases intended for the exclusive display of "Fair & White" products. When he asked the retailer why this had been done, the retailer responded that he thought the "Fair & Brite" product was part of the "Fair & White" line. In Michel Farah's declaration and testimony, he also cited reports of confusion from retailers and consumers who thought "Fair & Brite" was a new line of "Fair & White" products.

Defendants called several retailers to testify that they were not confused by the two separate lines, and that no customers complained to them that they were confused. Of course, a lack of complaints does not prove that the customers were not confused. This testimony has little probative value. "[W]hile very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Soweco*, 617 F.2d at 1186 (quoting *World Carpets*, 438 F.2d at 489).

Perhaps the most damaging testimony of actual confusion came from one of Defendants' own witnesses. Sofia Longchamp testified that she works for and is paid by Defendant Tomjai. She is physically located at the premises of another Defendant, G & P Factory Outlet, apparently there to promote Tomjai's products. She talks to retail customers on a regular basis. She stated that of the 100 or so people that she talked to about "Fair & Brite" and "Fair & White," about 50% (or about 50 of them) were confused about the two lines of products. Some were confused by the name, and others were confused by the appearance of the two different lines. This is considerable evidence of actual confusion.

### Application of Law to Facts

■ Employing the seven-part test for determining the likelihood of confusion, and the four-part test for a preliminary injunction, it is clear that Plaintiffs are entitled to injunctive relief.

#### Likelihood of Confusion

Plaintiffs have satisfied the two most important factors, i.e., strength of the mark and actual confusion. Plaintiffs' "Paris Fair & White" trademark is suggestive, and is sufficiently strong to merit protection against the directly competing use by Defendants' copy of Plaintiffs' mark which bears the name "Fair & Brite Paris." There was ample evidence of actual confusion, testified to by Plaintiffs' witnesses and at least one of Defendants' witnesses. Defendants' mark bears great similarity to that of Plaintiffs, and Defendants' four products are identical to four of Plaintiffs' products, which are their best sellers. The retail outlets and the consumers for the two competing lines are identical. The evidence further demonstrates Defendants' intent and bad faith in copying Plaintiffs' marks. The only element that is not present is identity of advertising, but this factor is insignificant in light of the presence of the other six.

#### Elements of Injunction

■ Plaintiffs have shown a likelihood of success on the merits based on the considerations set forth above, and under prevailing standards have satisfied the requirement of showing that they will be irreparably harmed if Defendants are not enjoined from using their copy of Plaintiffs' marks. *See, e.g., McDonald's,* 147 F.3d at 1310 ("a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of . . . [a] substantial threat of irreparable harm." (citing *E. Remy Martin & Co.,* 756 F.2d at 1530)). Additionally, Plaintiffs have presented other evidence of irreparable injury. Two of Defendants' "Fair & Brite" products (a lotion and a creme) contain hydroquinone, a skin-bleaching substance which the FDA does not permit for over-the-counter sales in concentrations greater than 2.0%. The labeling on these "Fair & Brite" products does not indicate the concentration of hydroquinone contained therein. Defendant Imana testified that she directed her manufacturer to follow FDA guidelines, but she provided no evidence that FDA regulations *were* being met. Furthermore, Imana acknowledged that no independent testing of the concentration of hydroquinone in her products is done. The Court also notes the unscientific method by which the original testing of Defendants' products was conducted. To the extent that consumers confuse Defendants' products with Plaintiffs', Plaintiffs face damage to their reputation and loss of customers caused by distribution of a possibly harmful substance. *Id.* at 1309–10 (damage to McDonald's reputation and loss of customers which could be caused by distribution of an allegedly inferior and possible dangerous product held out as McDonald's product

constituted irreparable harm). The threatened injury to the trademark owners outweighs whatever damage the injunction may cause to the alleged infringers, and the injunction would not be adverse to the public interest.

### Posting of Security Bond

▮▮▮ Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction

shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined....

This Court has the discretion to issue a preliminary injunction without requiring Plaintiffs to give security, notwithstanding the seemingly mandatory language of the rule. *See, e.g., Univ. Books and Videos, Inc. v. Metro. Dade County*, 33 F.Supp.2d 1364, 1374 (S.D.Fla.1999); *Popular Bank of Fla. v. Banco Popular de P.R.*, 180 F.R.D. 461, 463–65 (S.D.Fla.1998); *Campos v. I.N.S.*, 70 F.Supp.2d 1296, 1310 (S.D.Fla.1998). "Whether or not to require a bond in any particular case—and the amount of any such bond demanded—is within the discretion of the trial judge." *Univ. Books*, 33 F.Supp.2d at 1374 (noting that security generally was not required when, e.g., the party seeking the injunction has a high probability of succeeding on the merits of its claim). For instance, the bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882–83 (9th Cir.2003) (defendant failed to ask court to

set a bond or submit evidence as to what damages she might incur as a result of the injunction); *Halo Mgmt. LLC v. Interland, Inc.*, 308 F.Supp.2d 1019, 1027 n. 11 (N.D.Cal.2003) (defendant failed to request bond or present any evidence (other than unsupported assertions of monetary risk) regarding its likely damages).

In this case, the issue of bond was raised initially by District Judge Lenard when she ordered Plaintiffs, in conjunction with their motion for preliminary injunction, to "provide a good faith assessment of the sum that would adequately compensate both Defendants for their costs and damages if it is determined that Defendants were wrongfully enjoined or restrained." *See* Order to Show Cause (D.E. No. 49) at 2.[9] Plaintiffs responded by explaining that Defendants had not presented any evidence of any monetary damages they would sustain if a preliminary injunction in Plaintiffs' favor were issued. *See* Plaintiffs' Response to Order to Show Cause (D.E. No. 61) at 2. Plaintiffs therefore suggested that as there was no evidentiary basis upon which to set the amount of bond, given the court's wide discretion in this matter, none need be set.

Defendants subsequently moved to strike Plaintiffs' motion for preliminary injunction on the ground that Plaintiffs had failed to provide a good faith assessment in violation of court order. *See* Defendants' Motion Strike (D.E. No. 68) at 2. In responding to the motion to strike, Plaintiffs pointed out that Defendants, who by now had filed their opposition to the preliminary injunction motion, still had not offered any evidence regarding the damages they (Defendants) would suffer if the injunction were improvidently granted. *See* Plaintiffs' Response to "Motion Strike"

---

**9.** At that same time, noting there had been no response to Plaintiffs' preliminary injunction motion, Judge Lenard ordered Defendants to show cause why the motion should not be granted.

(D.E. No. 79) at 2. Accordingly, Plaintiffs maintained their position that no bond need be set. On the same day that Plaintiffs responded to the motion to strike, Defendant Imana filed an affidavit (in support of her own motion for preliminary injunction) in which she averred that "the costs and damages which may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained are to the best of my belief approximately $25,000.00." (D.E. No. 83 at 2).

Under the circumstances, the Court finds that a preliminary injunction bond in the amount of $10,000.00 is adequate to compensate Defendants should it later be determined they were wrongfully enjoined in this action. Plaintiffs are ordered to post bond in the amount of $10,000.00 within forty-eight (48) hours after receipt of this Order.

## II. Defendants' Motion for Preliminary Injunction

Defendants seek to enjoin Plaintiffs from infringing on their "Fair & Brite" trademark and trade dress, and also to restrain Plaintiffs from interfering with their business relationships with their customers.

As for Defendants' requested relief for trademark infringement, the motion is denied for the same reasons that Plaintiffs' motion is granted. The Court has made factual findings, including some relating to credibility of the witnesses, and has determined that Plaintiffs' fuchsia-colored line of products preceded Defendants' line, that Defendants' mark and packaging copied Plaintiffs' mark and packaging, and that Plaintiffs are entitled to the protection afforded by the trademark laws.

As for Defendants' claim for tortious interference, Defendants failed to show irreparable harm entitling them to injunctive relief. Defendant were able to quantify their sales and potential losses as a result of Plaintiffs' alleged tortious interference. The testimony clearly showed that money damages are available and capable of calculation to compensate Defendants for any proven tortious interference. Accordingly, injunctive relief based on this claim is inappropriate.

### Unclean Hands

Defendants also seek to bar Plaintiffs from obtaining an injunction based on the equitable doctrine of unclean hands. Specifically, Defendants claim two separate acts: first, they claim that Plaintiffs' fuchsia-colored line copies their trademark. This contention was dealt with and disposed of in the preceding sections. Defendants' other contention is that Plaintiff Gapardis copied the trademark and trade dress of their different product called "African Beauty, MJ" with a competing product called "African Queen, MJ."

"African Queen, MJ" is distributed by Plaintiff Gapardis, as the exclusive licensee of a separate corporation named Mitchell International Cosmetics Limited ("Mitchell"). That company has instituted a separate infringement action in this court against Tomjai for infringing certain of its products other than those at issue here, including the MJ Royal African Products line, which includes "African Queen, MJ." Defendants have counterclaimed for infringement of their "African Beauty, MJ" product, claiming that Gapardis' "African Queen, MJ" product is a counterfeit copy of their trademark.

Defendants failed to prove that Gapardis's trademark infringed on their mark. That question is one of the primary ones in *Mitchell International Cosmetics Limited v. Tomjai Enterprises Corporation,* Case No. 05–21956–CIV–Lenard, and this Court will not pretermit that issue on the scant evidence presented here. The parties

must fully litigate that question in the other pending suit.

■ Finally, unclean hands cannot be asserted against a party seeking relief as a free-floating defense unconnected to the conduct at issue. The conduct must be directly related to Plaintiffs' claim against Defendants. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 128 F.Supp.2d 926, 949 (E.D.Va.2001). In this instance, the alleged conduct relates to an entirely unrelated matter, and therefore the defense is inapplicable.

## *CONCLUSION*

Based on the foregoing discussion, the Court hereby

**ORDERS and ADJUDGES** that

1) Plaintiffs' Motion for Preliminary Injunction (D.E. No. 19) is **GRANTED**, as follows:

Defendants, their subsidiaries, parents, affiliates, agents, servants, employees, directors, officers, and attorneys and those persons or entities in active concert or participation with them, shall be preliminarily enjoined

(a) from using counterfeit products bearing Plaintiffs' trademarks or reproductions, counterfeits, copies, or colorable imitations thereof; such products consist of all Defendants' products bearing either "Fair & Brite" or "Fair & Brite Paris" marks or labels;

(b) except for surrendering to Plaintiffs the counterfeit products, from possessing, receiving, manufacturing, assembling, distributing, warehousing, shipping, transshipping, transferring, storing, advertising, promoting, offering, selling, offering or holding for sale, disposing, or in any other manner handling or dealing with any goods, packaging, wrappers, containers and recepticals, and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of Plaintiffs' trademarks and/or trade dress;

(c) from infringing Plaintiffs' trademarks and/or trade dress;

(d) from otherwise unfairly competing with Plaintiffs;

(e) from using any reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' trademarks and/or trade dress in connection with publicity, promotion, sale, or advertising of goods sold by Defendants, including, without limitation, health and beauty products bearing a copy or colorable imitation of Plaintiffs' trademarks and/or trade dress;

(f) from affixing, applying, annexing, or using in connection with the same any goods, false description or any representation, including words or other symbols, falsely describing, falsely representing such goods as being those of Plaintiffs and from offering such goods in commerce;

(g) from using any trademark, trade name, or trade dress in connection with the manufacture, sale, or distribution of any goods which may be calculated to falsely represent such goods as being connected with, approved by, or sponsored by Plaintiffs;

(h) from destroying, altering, disposing of, moving, removing, concealing, tampering with or in any manner secreting any and all business records, invoices, correspondence, books of account, receipts or any other documents or things relating or referring in any manner to the manufacture, advertising, receiving, acquisition, importation, purchase, sale or offer for sale, distribution, warehousing, or transfer of any counterfeit products bearing Plaintiffs' trademarks and/or trade dress; and

(i) from assisting, aiding, or betting any other person or business entity in engag-

ing in or performing any of the activities referred to in subparagraphs (a) through (h) above.

Plaintiffs shall post bond in the amount of $10,000.00 within forty-eight (48) hours after receipt of this Order.

2) Defendant/Counter–Plaintiff Tomjai Enterprises Corporation's Motion for Preliminary Injunction and Restraining Order (D.E. No. 43–1, 43–2) is **DENIED**.

3) Defendants/Counter–Plaintiffs Tomjai Enterprises Corporation and Aimalohi Imana's Motion to Strike (D.E. No. 68), filed on August 30, 2005, is **DENIED**.